My name is Dennis McCarty. I'm here for the appellant. The sole issue in this appeal is the denial of attorney's fees for a successful Fair Debt Collection Act in practice case. The appellant filed a summary judgment. It was granted. The appellee filed a summary judgment and it was denied. And we applied for attorney's fees under 1692 K.A. and was set forth. Within my brief, they're very straightforward. We argue that attorney's fees are mandatory for these type of actions. The judge in the case, the magistrate judge, listed several issues of why. You're asking for $130,000 in attorney's fees? Is that correct? Between two attorneys, it went. That's like $13,000 an hour for this case. We had it broken out by the hour, but you know, if the court found it to be too high, he could have reduced them. Not to deny it. And there's no real, you've got statutory damages for the plaintiff, for the client, is that correct? Yes, Your Honor. Who works at your firm? Well, she was not my firm at the time. It was Mr. Rayburn's firm. We've since merged, but she did contract work. She did website material. I guess my point is that there's no actual damages of mental anguish or undue harassment or any type of evidence. It was a violation in terms of how the credit company referenced itself. You all did not introduce any evidence of any type of mental anguish or harassment that she suffered. It was more simply related to the moniker of the company. That is correct, Your Honor. Which resulted in a statutory damage. That is correct, Your Honor. We did present case law that says that attorney's fees are not proportionate to damages under Beardet Collection Act cases. And like I said, if the judge felt like they were just too high, it was well within his power just to reduce them, but we felt like he abused his discretion by just arbitrarily denying them. It wasn't arbitrary. He wrote a pretty long... I mean, both judges wrote opinions on the subject, right? Yes, ma'am. They did write opinions. And they basically felt that you had trumped up... you or your partner had trumped up the lawsuit. And I don't understand that argument. That your client didn't even reside in Texas, that she lived in Shreveport with her boyfriend. Your Honor, I disagree with that respectfully. She actually did reside in Texas. She actually had a home or a room there. Her parents lived in Texas. With where she had her personal belongings and even received mail there. I included that in the brief that... Well, how come she had an apartment in Shreveport and that's where the law office was where she was employed? Your Honor, she was just living with a boyfriend she's not even with anymore. I mean, I don't know why she... Well, I don't care what... My point is that's where her employment is, right? Five days a week? I'm not for sure. I don't think it was full-time employment. I'm not for sure the actual day she was there. But, you know, the difference, the travel distance between the two is probably 45 minutes if I'm not mistaken. I'm not an expert on Louisiana, but I think it was about a 45-minute drive. But you didn't file the suit in Louisiana, so I suppose you had reason to file it in Texas. No other reason. We could have filed it in Louisiana very easily. It just... She received mail there. She asked for the... Are you admitted in the Louisiana Bar or the Federal Bar in Louisiana? No, ma'am, but Mr. Rayburn is. It could have been filed there very easily. As a matter of fact, we've had cases there together. I just pro-hawk in. But she receives mail there. This was not a one-time occurrence, per se, send me the statement. I mean, she... What kind of mail? She received an AT&T bill. Now, this is just samples that she actually still kept. I mean, you know, like I said, mail gets thrown away. We used samples that was just almost by accident that was still around. But there was an AT&T bill. There was a correspondence from a dispute that she disputed in account with TransUnion, and that's important because TransUnion will only dispute issues if they have your main address, and that main address was her Hallsville, Texas. So TransUnion... Why did she have to call this Bureau, CBOTS, why did she have to call them to have, to request that the statement be sent to the Texas address, if that's the case? To be honest with you, Your Honor, the real reason... Debts are bought and sold almost like trading cards. I mean, it's not uncommon for a debt collector to sell these on a... I don't know about monthly, but... Well, I agree with you on that, but wouldn't the acquisition of a debt carry with it the debtor's identity, obviously, the location, all means of contact with the debtor, and of course the amount that's due? Wouldn't that be information? I'm just curious as to... And by the way, you have a meeting with the client on August 13th of 2015, Mr. Rayburn does, which is included in the fee application, but then the phone call is, I believe, later that day, the phone call to CBOTS asking for the statement to be sent to the Texas address. Yes, Your Honor. I just, I find it very curious that that's the order of events. If they already had her address, and that was, in fact, her home address, it seems to me a debt, even one acquired by a third party would carry that information. Well, I'll be honest with you, Your Honor, the main reason... That's why I want you to be honest. I think the last case we had someone say, I'll be honest with you, and I guess maybe from my district court days, that always struck me as a bit gratuitous. We assume you're going to be honest with us in everything you say here. Yes, Your Honor, it's just a figure of speech I say. I understand. I apologize. But anyway, she called to find out if they even still had it. The debt was several years old by this point, and it wasn't even 100 percent sure that they even still had it. And she called to basically inquire about the debt, and with other things that I've listed as just a sample, she got most of her mail at the Hallsville, Texas address. Maybe she didn't want her boyfriend to see her mail. Maybe they weren't going to break up. I know they're no longer together. I just, maybe there was reasons. Maybe is a guess. When we say maybe this or maybe that, we don't know, and it's not in the record, that there is a definitive reason. One thing I do know is she did receive mail on a regular basis at the Hallsville, Texas address. That is factual. Now, why she wanted this sent there, I can assume that's just because most, if not, I don't know about all, but most of her mail actually went there. This was not a one-time occurrence where she said, hey, mail this one piece here for me, please. This is where she would go home. She had a room with her personal belongings, and she would stay there a couple nights a week and collect her mail and go back. Let me ask this on a different note. Was there not a demand sent by you or her co-counsel a demand to the defendant saying, oh, by the way, you should be advised that you are in violation by referring to yourself as credit bureau, all the language that you were successful on, was there a demand made that they discontinue that practice, or did we just go straight to court and say, we win, and now we're here for our fee? Approximately a year, maybe a year and a half. I don't have the dates. There was the Billups case. And we, well, Jonathan and I, we had separate firms then, but we filed a lawsuit against Credit Bureau of Greater Shreveport, and I'm almost positive, and I think they called them at that time Retail Merchants Association and Credit Bureau of the South. I'm almost positive they were involved. So they had previous litigation, and it got dismissed because we didn't prove that they were actually trying to collect a debt. So it got dismissed, and we actually appealed it up to the Fifth saying, you know, they're a debt collector using a bad name, and the Fifth Circuit said that we didn't prove that they were actually trying to collect a debt. Okay, but my question is specifically before this lawsuit was filed, was there a letter sent or any type of notification sent that they should cease referring to themselves in this title? You're saying that they must have known it because of it was mentioned when a separate issue was litigated previously. In this case, before we go to federal court and file a complaint, did we not send a letter stating, citing the law, here's what your practice is, and we believe your practice, you might be well advised to confer with counsel, because if you don't, we will then seek a legal remedy. The answer is no, Your Honor. We did not send any kind of notice prior to filing this. I would say, however, that we did litigate with them about a year and some change prior, so they were definitely unnoticed that they shouldn't be using this name, but we did not contact them for this case. What about Judge Payne's statement that indeed plaintiff's counsel admit in their motion that they, quote, warned defendant to take the mediation seriously because the attorney's going to be incredibly high if it couldn't get resolved, close quote, threatening $200,000 in fees? Yes, Your Honor, and... Just like all the other people who are trying to backtrack on Twitter and so on, you didn't really mean it, huh? No, no, I didn't mean to talk over you. No, no, Your Honor, that is not, but I will say that the whole purpose of that was just come to mediation with some authority to where we can try to settle this. A lot of times I've been in mediation myself where they come with almost no authority and it was just like, please take it seriously because this could get expensive fast. The $200,000 shouldn't have been used. I mean, it was probably in bad taste. Looking forward, that won't be used again other than please take mediation serious, but that was the whole purpose of the email. It just kind of got away from me. That's all, but we'll own up to it. And you were charging for a conference with the client that predated her filing suit by several months, and in fact, that was the call where she set this thing up. She did call. And your partner was on the phone call listening in. I'm sorry, I didn't mean to talk over you. Actually, he was not on the phone call, Your Honor. He was not listening in. He was in the building. I think he walked in the room once and walked back out, but Your Honor, he was not on the phone. He was not listening. That is a misstatement of the facts because that didn't happen. He was in the building. I believe it was even done in the, I don't want to speak for my partner, but I believe she did it in the kitchen of the office, and he walked in and walked out, but he was not on the phone. It was just really, really, well. I'm not sure what sustained, but I don't know. It's the kind of case that almost makes somebody want to inquire about sanctions, and that's not an issue, but the idea of $8,000 in travel fees and, I mean, you know, this deal is in Marshall, which is 30 miles from my house, I mean, you know, right on the Texas line. $8,000 in travel fees and billing at $450 an hour, I mean, this is just not that kind of case. I just don't understand the conscionability of presenting a bill that high. Never mind you're arguing about the district court could have reduced it. It's just hard for me to fathom how one would present a bill that high for this kind of claim and expect just purely on the wording of a statute, got you, you know, here it is, and that seemed to be what bothered the magistrate judge and the district court. They recognized there's not a lot of case law on special circumstances, but they were both struck that if there ever was a special circumstances case, this was it. And so they flew upstream and denied it just because of the way this whole thing was presented. So for me, at least, you got a tall burden to persuade me of how I shouldn't reach the same conclusion. Frankly, I live in Shreveport. You can take judicial notice. I know Mr. Pui was a lawyer, but I know where this is, and I'm just having trouble with $8,000 in travel fees and so forth when you're talking about a few miles. I mean, just that, let alone $450, but it's kind of a lawsuit. I don't get that. So the point is, why isn't this a special circumstances case based on the face of it and the findings below to which only $1,000 in statutory bond is what's warranted? Well, like I said, there is case law that says that attorney's fees are not proportionate, and as far as $450 an hour, I actually just recently in the northern district, we had a hearing, a hearing on damages for a debt collection case where they defaulted, and we had an oral hearing, and I had to present the evidence and bring my client and discuss her mental anguish, and at the end, he wanted to address my attorney's fees, and I showed him, and I even, full disclosure, informed him that I was recently denied attorney's fees in the eastern district, and that I have had $450 per hour ruled in the past on multiple cases, and he granted me the $450 in that case as well. Well, there's a lot of, and I'm going to move past it, but the district court found, and even here, and cites some other cases in which even the briefing, the cut and paste, etc., etc., just doesn't seem to comport with asking for $450 an hour on a collection case. He has some fees, and that just seemed to bend over the top, and at least for me, I'm still not persuaded that some of that's out the loop, but you've given the best answer you can, and you've reserved your rebuttal time. Mr. Bouie will come up, and you'll get another shot to say whatever it is, okay? Okay. All right. Thank you. Mr. Bouie, you're up. Good morning. May it please the Court, I'm Ralph Scott Bouie, and I represent the Appellee Credit Bureau of the South. I think the order of events is the most telling to me. The record of the appeal at 1286 shows that the plaintiff acknowledged that her attorney was her attorney at least by April of 2015. On June the 11th, 2015, the plaintiff posted a blog, it said title credit this, credit that, which is evidence that the plaintiff received some legal information on the use of the term credit bureau by a debt collector. It refers to that blog. The plaintiff refers to that as illegal, so she must have received some instructions as early as June 2015. On August the 13th, as you said, the plaintiff's attorney is actually charged for time, 1.35 hours justification, met with the client, and reviewed the issues on that date. There was no case in existence. The two factual matters that are claimed in the complaint, one occurred on August the 18th, 2015. Well, the plaintiff had called the defendant and said, when a debtor requests a validation of the debt, the debt collector is required to mail it to them. And the Debt Collect Credit Bureau of the South mailed her the validation of the bill, the $107 water bill from the city of Shreveport, and there was a cover sheet mailed it on August the 18th, 2015. On the cover sheet, it identified the Credit Bureau of the South, it identified the water bill owed the city of Shreveport, and it stated in the communication, this is a communication from a debt collector, provided at your request, your prompt attention is now required in order to clear this matter. I didn't believe that was a demand letter. I didn't believe that was an attempt to collect the debt. It was just a cover on the bill. The court found it was an attempt to collect the debt. My client decided, let's pay the thousand dollars and go on. So we didn't appeal the issue, but we September the 22nd, 2015, was the phone call placed by the plaintiff in her testimony in the presence of her attorney, because she testified. We asked her at the deposition, who was that person you're referring to at the end of the deposition? Oh, that's Mr. Rayburn. So the only evidence in the record is that Mr. Rayburn was there when she was making the phone call. What opposing counsel stated, that's not in the record. And she was in Louisiana, he was in Louisiana at the law office calling the defendant's receptionist in Louisiana. So no debt collection in Texas, but from the conversation and the transcript, it's pretty clear what they were trying to do. So all the events of facts alleged in the complaint occurred after the attorney. And when we talk about this concept of she's really a resident of Texas, I mean, she has a Louisiana driver's license, showing she lives in Louisiana. Her vehicle's registered in Louisiana, it's registered in the same address she's living at. Her Twitter account shows that she lives in Shreveport. Her LinkedIn account shows she in Shreveport, and she was employed by her attorney. That's how we first found that out. And the plaintiff's actually registered to vote in Caddo Parish, Louisiana, and she did vote. And the plaintiff filed her federal and state tax income returns as a resident of Louisiana. So there's numerous evidence in why they file a complaint stating the plaintiff is a citizen and resident in the state of Texas. Why did they do that? Simply. The term credit bureau is not defined in the Federal Fair Debt Collection Practices Act. It's not defined in the Fair Debt Reporting Act. In the Fair Debt Reporting Act, they call it a consumer reporting agency. Where is credit bureau defined, the term? It's defined in the Texas Financial Code. So when they filed this complaint, I think, in the wrong venue, in the wrong jurisdiction, they filed it to include the state cause of action where credit bureau is defined. Counsel, what is your best case? If you have a Fifth Circuit case, it would be great. Otherwise, your best case that we're in a court has applied the special circumstances exception for attorneys. I have one other than what the magistrate stated. I do not have one I've searched. I thought the case would be at minimum transferred to the Western District of Louisiana. I did file a motion to transfer it. I was not in the pleadings before the magistrate, but subsequent on this appeal, I did some research and found, and I knew this inherently because I'd gone to law school like everybody else, but I didn't think about the simple fact that an attorney can't be an advocate and be a witness. And that's where I've discovered that an attorney should not even have been involved in this case because he witnessed the facts. Well, that was my next question, but I suppose we get into the expenses of filing motions to disqualify when, in fact, your exposure, as you said, was the $1,000 to be done with this, notwithstanding the attorney. There's a lot of issues we could have done, but my client doesn't. As we stated, he's a small family business, and this has been a struggle for him to do this. My client would admit, with everything that's gone on, using the name Credit Bureau is not a wise decision. It's no longer part of the name. Credit Bureau of the South is registered with the Louisiana Secretary of State? It was. It's now changed to Delinquent Recovery. The name of the company was registered with the Secretary of State, and the same corporation changed their name to Delinquent Recovery. So, is that the same place that was located downtown Shreveport forever? Your Honor, yes, sir. So, who's the name donor? Delinquent Recovery. No, I mean person. Has this been family-owned forever? I mean, when it's owned by an individual? Yes. Who is that? Greg Juneau. Juneau? Yes. Okay. Mr. Juneau is actually in court right now. But, I mean, it's registered as an entity, though. Yes, he owned. I'm sorry. I didn't understand. It's not a sole proprietorship. It's a corporation. He's a sole shareholder. He and his wife are the sole shareholder of the corporation. So, after this suit or whatever, the name or whatever the nomenclature was changed to what you said, delinquent whatever? Yes, Your Honor. As a result of this lawsuit? Yes. Okay. All right. A thousand dollars has been paid, and so the rest of what remains is this litigation about the attorney's fee, correct? Yes. All right. All right. Unless you have something else, I think we've got you. Thank you, Your Honor. All right. Back to you, Mr. McCarty. So, Mr. McCarty, are you licensed in Louisiana? No. No, sir. No. So, you list your Mississippi bar number, your Supreme Court bar number. Yes, Your Honor. But your address is in Texas. That was my point. I conferred with my partner about the travel expenses, and he lives in Shreveport. I live in Shreveport, and I practice in federal court in all four districts in Texas and in Mississippi, the two districts there. He practices in Louisiana, and I pro hoc in on his cases in Louisiana, but I do not have a Louisiana license, but he does. But I guess about the transportation expenses is that I live in Granbury. One other question. All right. So, Mr. Raven is in Baton Rouge. Actually, he lives in Shreveport as well. Jonathan Raven, the Raven Law Firm, 301 North Main, Baton Rouge. So, that used to be, but that's not anymore. Okay. So, who's Fong Thanh Lee, the Lee Law Firm, Houston, Texas? Yes, Your Honor. Attorney to be noticed. So, who is that? That was a colleague that I bring on if there's Texas issues. I don't do Texas law, so he came on board for the Texas side of it. You're in Carrollton, Texas, but you don't do Texas law? I do zero Texas law, Your Honor. So, whose law do you do? I do all federal. I'm exclusive to Fair Debt Collection and Fair Credit Reporting Act, and that's it. So, it took a whole plaintiff that purportedly is in Louisiana. Those were the attorneys involved, Your Honor. Now, Raven and I have since merged, and we're now one firm. Back then, he had his own firm in Louisiana, and we just worked with each other. Fong Lee is out of Houston, and whenever I have state issues, he jumps on board and does the state side. So, he was required, and he came to the hearing. We had the summary judgment hearing. He was there, and when we basically waived if we could get a ruling that day, as I argued, we waived the Texas side just so we can get a ruling that day because, as the judge ruled, there are fact issues. So, that would have to go to the And so, at that point, you know, Fong Lee, the state side went away, but as far as the travel expenses, I just... Are those fees included in this? I do not believe so, Your Honor, no. If you waive part of the case, then... Your Honor, off my memory, I do not believe he is in that at all. That is Mr. Raven and mine, and as far as... The $1,000 judgment was for violation of the FDCPA, and only Texas law defines a credit bureau. Does that mean that the FDCPA incorporates more stringent or different provisions of Texas law? No, Your Honor, like I said, that was not even required, needed, or anything else because the Okay, the Fifth Circuit has ruled in the McKenzie case, I believe, that a debt collector cannot use the term credit bureau if they're not... Why didn't you just send them a bill for $1,000 and back off? I wished I would have. No, you don't, because you make your living off of these cases. Well, I do spare debt collection, and I do credit reporting. I'm exclusive to both, and like I said, Your Honor, after talking to Mr. Raven, I guess the majority of the travel expenses was me driving. I actually live and work out of the office, mainly out of Granbury, and it's about a four-hour drive. And then apparently, this lady is working for Mr. Rayburn in Shreveport, but you represent that she's a resident of Hallsville or Harrison County, Texas, and then you get called on that in a hearing, and you represent to Magistrate Payne that it was a, quote, mischoice of words. I actually offered... And up here now, you're saying she's a resident of her parent, but she votes in Shreveport. Her car is licensed in Shreveport. She works in Shreveport. I mean, gosh, how many sides of an issue can you take with a straight face? There really isn't any sides, Your Honor. It's not... There was no malice or deviant intent at all. As a matter of fact, if anything else, she received her mail there, and I just... Maybe I assumed you could have a dual residency. I mean, if anything else, it was just a dumb error on my part. It looks like game in the system to me. I'm going to just be straight up. Your Honor, I can assure you. Well, I mean, I read it. I don't know, and I'm speaking only for myself. Been around a long time, seen a whole lot of lawsuits, and it looks like a gotcha on the statutory claim, and then for there, the rest of this with five lawyers, all the hearings, all this stuff about the locations and so forth, it just doesn't pass the test, to be frank. Like I said, it just doesn't pass a test. It really doesn't in terms of what's there, but we've got the narrow issue of the attorney fee and special circumstances, and we've got all the record, and we're going to decide that, but I hope you take away from the gratuitous comments. There's something about the appearance of all this that just doesn't quite square. Just something to be thought about is the point. Well, Your Honor, I apologize for that feeling. Like I said, I argued in the hearing is that we felt like she got her mail there, which she did. I understand that, but I guess all I'm telling you is in the complete information we've got, we've got the other footnotes and sites, the other cases you've been involved in, in which there's been disqualification and some other things, tracking that, again, put into the mix. They're not here, but they do make it wary in terms of looking straight on at the claims that are presented. That, to me and us, is just not a good thing. None of that may be said in any ruling that we make, but it's just a word to the wise. It just doesn't. Eight lawyers on a claim, but at any event, that's just something to lay on your heart, so to speak, think about as you're going forward. Since you say you do a lot of federal court work, we take a real strong eye to look beneath these things. Anyway, we've got the argument in the briefing. We'll decide it, and we'll finish it. I appreciate the presentations by both sides, includes the argued cases, and we stand in recess.